Clyde JACQUET, Individually and on be-
half of her minor children, Orenton Jac-
quet, Jr. and Darrin Jacquet and on be-
half of all others similarly situated, et
al., Plaintiffs,

v.

Garland L. BONIN, Commissioner of the
Louisiana State Department of Public
Welfare, Individually and in his official
capacity, Charles C. Mary, Jr. Commis-
sioner of Health, and Social and Rehabil-
itation Services, Defendants.

No. 72-2589.

United States District Court,
E. D. Louisiana.

July 21, 1975.

Anne Pardee Buxton, Jack M. Stolier, New Orleans, La., for plaintiff.

Terry F. Hessick, Louisiana Dept. of Public Welfare, Legal Division, Baton Rouge, La., for defendants.

Ford Dieth, Asst. U. S. Atty., New Orleans, La., William Guste, Atty. Gen. State of Louisiana, Baton Rouge, La., Michael H. Cook, Dept. of Justice, Washington, D. C., for H.E.W.

CASSIBRY, District Judge:

## REASONS FOR DENIAL OF MOTION FOR PRELIMINARY INJUNCTION

This suit is a class action challenging two policies of the welfare department of the State of Louisiana. Under the first policy the department reduces the current assistance grant of a family receiving Aid to Dependent Children in order to recoup prior overpayments resulting from the failure of the head-of-the-household to report all income. Under the second policy the department terminates from the food stamp program a household found to have failed to report all its income. The plaintiffs-intervenors who represent members of two subclasses of households affected by these policies—ADC recipients, food stamp recipients—seek relief from these two policies by a motion for preliminary injunction. The reasons for denial of the preliminary injunctive relief as to these two policies are set out separately.

## THE AID TO FAMILIES WITH DEPENDENT CHILDREN PROGRAM

This part of the case arises under Title IV of the Social Security Act, section 401, *et seq.*, 42 U.S.C. section 601 *et seq.*, which establishes the Aid to Families with Dependent Children (AFDC) program. That program is a cooperative federal-state program which provides aid in the form of cash assistance and social services to needy dependent children and their caretaker relatives as defined therein.

Plaintiffs-intervenors (hereinafter plaintiffs) have challenged the validity of a regulation issued by the Department of Health, Education and Welfare (HEW) under that program appearing at 45 C.F.R. 233.-20(a)(12)(i), 39 F.R. 22269 (June 21, 1974.)[1] This regulation essentially permits states to recoup prior overpayments of AFDC to which recipients were not entitled from the current assistance grant when the recipient does not presently have income available in the amount of the proposed recoupment. However, that regulation only permits such recoupment when the prior overpayments were occasioned by the willful withholding of information by the recipient regarding income, resources, or other information affecting eligibility for or the amount of the assistance grants. The named plaintiffs are recipients of aid under Louisiana's AFDC program whose grants have been reduced by the state in order to recover prior overpayments of assistance resulting from their willful failure to report income. While plaintiffs' motion for a preliminary injunction requests no relief specifically against HEW, determination of the legal validity of that regulation is crucial with respect to determining the validity of Louisiana's recoupment policy; since title IV is silent on this matter, the federal regulation provides the basis for such a state policy.

Plaintiffs challenge HEW's recoupment regulation as being in contravention of: (1) the purposes of the AFDC program; (2) Section 402(a)(7) of the Social Security Act; and (3) Section 402(a)(10) of the Social Security Act.

After hearing extensive testimony and oral argument, and reviewing the briefs and exhibits submitted by the parties, this Court is convinced that plaintiffs have failed to demonstrate any likelihood of success on the merits of this action for the reasons set forth below. Thus, plaintiffs' motion for preliminary relief on this matter must be denied.

---

1. The regulation was revised and published on that date to conform with a court order in

*NWRO v. Weinberger,* 377 F.Supp. 861, 869 (D.D.C.).

**(a) The Purposes of the Social Security Act.**

Plaintiffs have argued that recoupment of prior overpayments is in contravention of the purposes of the Social Security Act, which are enumerated in Section 401 of the Act, 42 U.S.C. § 601. This Court sees no merit in this contention.

HEW's recoupment regulation permits states to reduce a recipient's current assistance grant in order to recover prior overpayments which were caused by his own willful actions. The regulation is essentially one which furthers states' interests in fair, equitable, and efficient administration of their AFDC programs by providing them with a vehicle both to deter willfully inaccurate reporting (or failure in reporting) of information which affects the amount of the assistance grant, and to recover overpayments caused by such reporting so that the vast majority of welfare recipients who accurately report such information are not disadvantaged.

HEW has indicated that the regulation does not mandate that states recoup because program conditions in the states vary. For instance, states differ in the amount of funds which they allocate to their AFDC programs; some states pay need in full as determined according to their state's standard, while others pay varying percentages of that need. Since conditions and fiscal resources thus vary considerably among the states, the necessity for recouping overpayments in order to deter inaccurate reporting and attain a fair apportionment of funds may also vary. Therefore, recoupment under HEW's regulation is at the states' discretion.[2]

This Court believes that states should be permitted to recoup overpayments under the circumstances permitted by HEW regulations since states have limited and finite resources to commit to their AFDC programs. Since each recipient's grant is determined by deducting income and resources from the state's standard of need, it is essential that a state agency receive accurate information regarding each recipient's income so that it may distribute its limited resources in a fair manner.[3] Should the agency's funds become prematurely depleted, the agency may be required to reduce benefits to all recipients, or it may be precluded from raising benefits. By permitting states to recover a percentage of overpayments where a recipient has willfully withheld information thereby obtaining benefits to which he or she was not entitled,

**2.** Moreover, the desirability of recoupment may vary on a case-by-case basis within each state. Where the recipient has no (or limited) income and resources above the need level recoupment of a percentage of the overpayment may well be the most reasonable deterrent to the willfully inaccurate reporting of income or resources. Plaintiffs have argued that criminal prosecution of a parent of a dependent child may act as an appropriate deterrent to willfully inaccurate reporting. However criminal prosecution for welfare fraud could well result in the jailing of the needy dependent child's caretaker relative. Since in most instances the child is already dependent as a result of the incapacity or desertion of one or more parents (see Section 406(a) of the Act, 42 U.S.C. § 606), incarceration of the remaining parent could thus result in far more severe hardship on and punishment of the child than the recoupment of a small percentage of a welfare grant. Any other criminal penalty could well be meaningless. By virtue of its optional status, HEW's recoupment regulation enables the state agency to determine on a case-by-case basis which method of deterrence, if any, of such fraud would be most consistent with the purposes of the act and the effective administration of the program.

**3.** The primary basis for entitlement to benefits under the public assistance titles of the Social Security Act is financial need. However, the Act itself does not define a standard of need; that is a matter left to the discretion of the states. Neither does the Act prescribe the level of payments to be made under the program. That, too, is a decision committed to the state. Further, not only does a state have considerable discretion in setting the level of the need standard, it also has the right to limit the proportion of recognized need which it will meet with welfare payments. A state may, for example, furnish only 75 percent of an individual's or family's need under the state standard. *See Rosado v. Wyman*, 397 U.S. 397, 409, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). Or it may establish a maximum amount which it will pay to any individual or family. *See Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

the recoupment regulation provides the state with a tool for eliminating any incentive to inaccurate reporting and provides a method by which the state may recover such overpayments. In this way the vast majority of recipients who accurately report their income and resources are not disadvantaged.[4] In the absence of authority to recoup such overpayments, a state's ability to require accurate reporting of information would be severely limited.

This is especially so in a state like Louisiana which pays only approximately 60 percent of the minimum standard of need, and where there is thus already a strong incentive for the recipient to report income and resources inaccurately; and yet, absent the accurate reporting of information regarding income, resources, and other pertinent data, administration of the state welfare program could be severely handicapped, and a fair distribution of the state's limited funds could be impossible.

One other federal district court has recognized the permissibility of recoupment and its value as an administrative tool. In the unreported case of *Lomax v. Lavine*, Civil Action No. 72–Civ. 2457 (S.D.N.Y., July 31, 1972), the Court denied a motion for a preliminary injunction against the application of a New York welfare regulation which provides for the reduction of current assistance grants over a six-month period to recover duplicate payments procured by fraud. The Court stated:

> . . . the public fisc is not an unlimited financial resource. Such an injunction would encourage perjury, larceny and fraud, a purpose which does not commend itself to a court of equity. . . .

No other reasonable remedy suggests itself. Suing the recipients and recovering Civil judgments would likely be expensive and unrewarding. Charging these welfare mothers with crimes might well be socially counter-productive. Convictions would be of necessity so selective and irregular as to be arbitrary and discriminatory, or else the state criminal courts would have no time for other crimes. . . .

> Balancing the equities requires us to avoid a preliminary injunction which will place a premium upon fraud, and give members of the plaintiff class an unfair advantage over those honest mothers who are not enjoying duplicate payments, and are limited, because of finite state funds available, to a bare 90% of computed need, based on 1968 costs of living [*Rosado v. Wyman*, 397 U.S. 397 [90 S.Ct. 1207, 25 L.Ed.2d 442] (1970)]. It is unfair to those beneficiaries to let such a large amount of money be diverted, wrongfully, from its budgeted purpose, and it is likewise unfair to taxpayers. (*Lomax, supra* at pp. 11, 12).

Plaintiffs cite four federal court decisions in which district courts have invalidated state recoupment regulations as contravening Sections 402(a)(7) and (10), and the purposes of the Social Security Act.[5] However, for reasons described herein, this Court disagrees with those decisions and agrees with the federal district courts in *NWRO, supra,* and *Lomax, supra* that recoupment of prior overpayments from the current assistance grant is consistent with the Act where the recipient caused the overpayment by willfully withholding pertinent information.

---

**4.** Plaintiffs' arguments focus upon the effect of recoupment upon the dependent child whose caretaker relative willfully either inaccurately reports or fails to report information and thereby receives a payment to which he or she is not entitled. This entirely ignores the plight of the majority of dependent children whose parents accurately report such information as required by law. Each time the parent of one dependent child receives an overpayment as a result of willfully withholding accurate information concerning income, resources, or other pertinent circumstances, other equally needy and de-

pendent children may be subject to reduction of their grants if the overpayment is not recouped. Furthermore, failure to recoup such overpayments may also decrease the opportunity for the state to raise its benefits to all recipients by depleting limited welfare funds.

**5.** *Cooper v. Laupheimer,* 316 F.Supp. 264 (E.D. Pa.1970), *Holloway v. Parham,* 340 F.Supp. 336 (N.D.Ga.1972), *Bradford v. Juras,* 331 F.Supp. 167 (D.Or.1971), and *Caruthers v. Friend,* Civil Action No. 7188 (M.D.Tenn., February 7, 1974).

Plaintiffs argue that any practice which denies aid to an eligible child is not permitted under the Act. However, the United States Supreme Court has clearly indicated that state rules which further efficient program administration conform to the Social Security Act, even though the application of such rules may result in the denial of, or reduction in, assistance to an otherwise eligible child as a result of his caretaker relative's failure to abide by such rules. *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971); *Snell v. Wyman,* 281 F.Supp. 853 (S.D.N.Y.1968), *aff'd* 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969); *New York State Department of Social Services v. Dublino,* 413 U.S. 405, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973).

If states may impose rules to assist the administration of their AFDC program, HEW clearly may promulgate regulations permitting them to do so. HEW's recoupment regulation is a regulation which furthers effective administration of the states' AFDC programs by providing them with a tool for receiving accurate reporting of information regarding income and resources, and thereby is fully consistent with the purpose of providing aid to needy and dependent children, "*as far as [is] practicable under the conditions in [each] State.*" Section 401 of the Act, 42 U.S.C. § 601. (Emphasis supplied.) Accurate reporting is essential for assuring that each AFDC recipient is eligible under the state's standard and receives the precise amount of assistance authorized under that standard.

Moreover, at least since 1951, (with the exception of a brief period from April, 1967 through June, 1968) HEW has maintained a policy of permitting recoupment from the current assistance grant, at least where the recipient caused the overpayment by willful withholding of information. This long standing interpretation of the statute by those charged with its execution is entitled to be given great weight absent compelling indications that it is erroneous, especially when Congress has refused to alter the administrative construction. *Zemel v. Rusk,* 381 U.S. 1, 11, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *Federal Housing Administration v. Darlington, Inc.,* 358 U.S. 84, 90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); *Arizona State Dept. of Public Welfare v. DHEW,* 449 F.2d 456, 468, 470 (9 Cir. 1971), *cert. den.* 405 U.S. 919, 92 S.Ct. 945, 30 L.Ed.2d 789 (1972). In this instance, no such compelling indication exists. Rather, HEW's recoupment policy is fully consistent with the purpose of the Social Security Act, and legislative history indicates that Congress was clearly aware of HEW's policy of permitting recoupment in such circumstances.[6] Thus, in addition to the reasons stated previously, Congress' failure to amend that Act subsequently to prohibit recoupment indicates its understanding that such a policy is fully consistent with the Act.

(b) Section 402(a)(7) of the Social Security Act.

Section 402(a)(7) of the Social Security Act, 42 U.S.C. § 602(a)(7), in relevant part, provides that "the State agency shall, in

---

**6.** Legislation was introduced in the Senate in 1972, which included a provision specifically requiring recoupment of overpayments from the current assistance grants, even where the overpayment was not caused by the recipient's willful withholding of information. (H.R. 1, as reported out by the Senate Finance Committee, section 404(f)(2), S.Rep.No. 92–1230, p. 814) In discussing that proposed provision, the Senate Committee on Finance recognized the existence of HEW's recoupment regulation which at that time authorized recoupment from the current assistance grant only in instances where the recipient willfully withheld information. S.Rep. 92–1230, 92nd Cong., 2d Sess. 476 (1972)

Since the entire legislative package (which contained controversial reform amendments which would have totally revamped the AFDC program) was defeated *in toto,* the above-mentioned section of the Senate Committee's report is simply a reflection of the view of its members at that time. However, it does indicate that Congress was then aware of HEW's existing regulation. Congress' failure subsequently to enact legislation prohibiting recoupment from the current assistance grant of prior overpayments caused by the recipient's willful withholding of information indicates approval of such a policy in view of the congressional awareness that HEW regulations authorized such a practice.

determining need, take into consideration any other income and resources of any child or relative claiming [AFDC] . . .." The Supreme Court has interpreted this provision to preclude a state from assuming the availability of income to a recipient absent a showing that such income was "in fact" available to the recipient. Thus, in *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), and *Lewis v. Martin*, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970), the Court disapproved state regulations which permitted a state agency to consider income of an individual who was cohabitating with a child's mother or of a non-adoptive step-father (who had no legal duty under state law to support the child) in determining whether a child was needy. The Court did note such income could be considered where it was actually being made available to support the child. Also *see Van Lare v. Hurley*, 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975).

The focus of plaintiffs' argument with regard to this provision is that the recoupment from current assistance grants of prior overpayments where the recipient has willfully withheld income and resources violates this "assumption of income" rule by creating a conclusive presumption that the overpayment is available to meet the current needs of the family. This argument, however, misinterprets both the nature of recoupment and the Supreme Court decisions cited above, for in the recoupment situation, the recipient has at one time actually received the amount of the overpayment. Thus when a state recoups prior overpayments pursuant to HEW's recoupment regulation, it does not indulge in the assumption of income that was never available. Rather, the state is recouping an overpayment which was *actually* made available to a recipient at a previous point in time as a result of the recipient's purposeful failure to report accurate information. Moreover, no presumption about the present existence of income is being made, for it is known and intended that in those instances in which recoupment is deducted from the current payment, the amount of benefits will be lower than it would have been had there been no recoupment.

The only prior case to which HEW was a party in which recoupment provisions were challenged, *NWRO v. Weinberger, supra*, 377 F.Supp. at 869, also held that recoupment from the current assistance grant of prior overpayments caused by willful withholding of information did not violate Section 402(a)(7).

(c) Section 402(a)(10) of the Social Security Act.

Section 402(a)(10), 42 U.S.C. § 602(a)(10), provides that "all individuals wishing to make application for [AFDC] shall have opportunity to do so, and that [AFDC] shall be furnished with reasonable promptness to all eligible individuals." Plaintiffs contend that the Supreme Court has interpreted this provision to prohibit states from setting eligibility standards which exclude from a state's AFDC program any eligible individuals absent clear evidence that Congress has authorized such an exclusion. *Townsend v. Swank*, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); *Carleson v. Remillard*, 406 U.S. 598, 92 S.Ct. 1932, 32 L.Ed.2d 352 (1972). Plaintiffs then argue that the reduction of a recipient's grant in order to recover prior overpayments constitutes an impermissible eligibility standard in contravention of this provision of the Act as interpreted by those cases.

Plaintiffs' argument is based upon the fallacious assumption that Section 402(a)(10) entitles a recipient not only to eligibility for benefits but also to the actual receipt of a given level of benefits. However, the Supreme Court has indicated that this is not so. While Section 402(a)(10) requires a state to provide aid to all individuals who qualify for aid under the federal statute and the state plan, this provision is directed toward the question of eligibility to participate in the program and is not intended to provide individuals with any particular level of benefits under the program. *Jefferson v. Hackney*, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *Dandridge v. Williams*, 397 U.S. 471, 481, 90

S.Ct. 1153, 25 L.Ed.2d 491 (1970).[7] In *Jefferson,* in describing Section 402(a)(10) of the Act, the court stated:

> That section [42 U.S.C. 602(a)(10)] was enacted at a time when persons whom the State had determined to be eligible for the payment of benefits were placed on waiting lists, because of the shortage of state funds. The statute was intended *to prevent the States from denying benefits even temporarily, to a person who has been found fully qualified for aid.* See H.R.Rep.No.1300, 81st Cong., 1st Sess., 48, 148 (1949); 95 Cong.Rec. 13934 (remarks of Rep. Forand). Section 402(a)(10) also prohibits a State from creating certain exceptions to standards specifically enunciated in the federal Act. See, e. g., *Townsend v. Swank,* 404 U.S. 282 [92 S.Ct. 502, 30 L.Ed.2d 448] (1972). *It does not, however, enact by implication a generalized federal criterion to which States must adhere to their computation of standards of need, income, and benefits.[14] Such an interpretation would be an intrusion into an area in which Congress has given the States broad discretion,* and we cannot accept appellants' invitation to change this longstanding

statutory scheme simply for policy consideration reasons of which we are not the arbiter." 406 U.S. at 545, 92 S.Ct. at 1731. (Emphasis supplied, footnote omitted.)

Further, in *Dandridge v. Williams,*[8] 397 U.S. at 481, 90 S.Ct. at 1159, the Supreme Court stated:

> . . . the practical effect of the Maryland regulation is that all children, even in very large families, do receive *some* aid. We find nothing in 42 U.S.C. § 602(a)(10) 1964 ed., Supp. IV) that requires more than this.[12] So long as some aid is provided to all eligible families and all eligible children, the statute itself is not violated. (Emphasis supplied; footnote omitted.)

These cases indicate that notwithstanding the validity of plaintiffs' interpretation of *Townsend, supra,* the proscription contained in Section 402(a)(10), does not encompass or extend to state practices or regulations which operate, not to deny eligibility to an individual, but only to reduce the amount of assistance for which he is otherwise eligible. This section, therefore, has no bearing on the HEW recoupment regulation since that regulation operates only to reduce the amount of an individual's AFDC grant.[9]

---

**7.** In three federal court decisions cited by plaintiff, *Cooper, supra, Holloway, supra,* and *Bradford, supra,* Courts have applied Section 402(a)(10) to invalidate state recoupment regulations which reduce level of benefits. However, all three were decided prior to the Supreme Court's decision in *Jefferson.* Moreover, none of these opinions cites *Dandridge* with regard to Section 402(a)(10). Yet both *Dandridge* and *Jefferson* clearly refute the interpretation placed upon that provision by the Courts in *Cooper, Holloway,* and *Bradford.* Further, in *Holloway,* the Court on three occasions cited HEW's regulation at 45 C.F.R. 233.-20(a)(3)(ii)(*d*), repealed 38 F.R. 22010 (August 15, 1973), which provided for recoupment where there was willful withholding of information with apparent approval, 340 F.Supp. at 338, fn. 4, 343, 344. HEW was not a party to any of these actions.

**8.** The Court in *Dandridge* upheld the validity of a Maryland regulation which set a maximum on benefits which would be provided to any one family regardless of the number of dependent children included therein. The result of

such a regulation was that each dependent child in a family whose need exceeded the maximum would receive less aid than a child in a family whose need did not exceed that maximum.

**9.** Plaintiffs cite the cases of *Lavine v. Shirley, Lascaris v. Shirley,* 420 U.S. 730, 95 S.Ct. 1190, 43 L.Ed.2d 583 (1975) and *Doe v. Rampton,* 497 F.2d 1032 (10th Cir. 1974), in which federal courts have invalidated certain regulations as contravening section 402(a)(10) of the Act, for the proposition that any proscription contained in *Townsend* extends to practices like recoupment. However, the regulations involved in each of these cases resulted in the termination of a parent's AFDC eligibility. Unlike those regulations, HEW's recoupment regulation does not authorize a state to terminate any recipient's grant. 45 C.F.R. 233.20(a)(12)(i)(*f*) provides that ". . . If recoupments are made from current assistance payments, the State shall, on a case-by-case basis, *limit the proportion* of such payments that may be deducted in each case, so as not to cause undue

■ For the reasons stated above, this Court rejects plaintiff's arguments regarding their likelihood of prevailing on the merits of their contention that HEW's recoupment regulation is in contravention of the Social Security Act. Since this Court has not been presented with any evidence that Louisiana's recoupment policy violates the federal regulation, plaintiffs' motion for a preliminary injunction against Louisiana with regard to the state's recoupment policies must be, and hereby is, DENIED.

## THE FOOD STAMP PROGRAM

The injunctive relief sought by plaintiffs-intervenors would restrain the state welfare department defendants from denying food stamps to households who obtain such stamps through fraud, and would require the recertification of all households thus denied.

Plaintiffs-intervenors and the class they represent challenge provisions of the Food Stamp Program regulations [10] which authorize a state agency [11] to disqualify from program participation any household who obtains food stamps through fraud. The federal regulation is the source of a policy provision in the Louisiana State Food Stamp Manual [12] which authorizes termination of a household's food stamp allotment where fraud is involved. Both the federal regulation and the corresponding section of the State Food Stamp Manual are challenged on the grounds they violate various provisions of the Food Stamp Act (7 U.S.C. §§ 2013(a) and 2014(b)).

Plaintiffs-intervenors are all present or former food stamp recipients whose benefits were terminated or applicants whose applications were denied because of willful fraudulent representations they allegedly made during the food stamp certification process. For purposes of this motion only, the alleged fraudulent representations will be assumed to have occurred. Plaintiffs-intervenors contend that even if they are guilty of making fraudulent representations, they are nevertheless eligible to continue to receive food stamps. This contention brings into focus the central issue on which this controversy revolves.

A review of the Food Stamp Act of 1964, as amended, and the regulations issued pursuant to that Act, is necessary to an understanding of the issues here presented.

The declared policy of Congress in authorizing a food stamp program was, primarily, to "alleviate . . . hunger and malnutrition" by permitting "low-income households to purchase a nutritionally adequate diet through normal channels of trade." (7 U.S.C. § 2011) Authority to formulate and administer a food stamp program was vested in the Secretary of Agriculture to whom Congress delegated broad authority to issue

hardship. . . . " (Emphasis supplied) Implicit in the use of the word "proportion" is the fact that a recipient's eligibility for cash assistance will not be terminated. Moreover, the recipient will still be eligible for medical benefits under the Medicaid program established pursuant to title XIX, section 1901, et seq. of the Social Security Act, 42 U.S.C. 1396 et seq. See Section 1902(a)(10). HEW's recoupment regulation simply permits a state to reduce the level of a recipient's grant.

10. The challenged regulation (7 CFR § 271.-7(d)), in relevant part, reads as follows:
(d) * * * If the State agency finds that any eligible household has failed substantially to comply with the provisions of this part, the Plan of Operation, or any procedures or instructions issued by FNS or the State agency resulting in the fraudulent acquisition of coupons, such household may be disqualified from further participation in the program by the State agency for such period of time as the State agency shall determine.

11. A State agency is the agency of the State government responsible for administering the Food Stamp Program within the State. In Louisiana, that agency is the Health and Social and Rehabilitation Services Administration.

12. Section 12–305 of the Louisiana State Food Stamp Manual, also challenged, reads in relevant part, as follows:
When it is administratively determined that the recipient has received bonus coupons for which he was not eligible due to fraud, a notice of adverse action shall be sent to the recipient and Form FSP–5–M submitted closing the case effective as soon as possible after expiration of the 15-day period.

regulations "for the effective and efficient administration of the food stamp program."

Participation in the Food Stamp Program is on a "household"[13] basis and eligibility is determined according to uniform national standards prescribed by the Secretary of Agriculture in consultation with the Secretary of Health, Education and Welfare. The Act prescribes only minimum standards of eligibility and delegates to the Secretary of Agriculture the establishment of additional and more detailed standards.

> The standards established by the Secretary, at a minimum, shall prescribe the amounts of household income and other financial resources, including both liquid and nonliquid assets, to be used as criteria of eligibility . . . (underscoring supplied) (7 U.S.C. § 2014(b)).

Regulations setting forth uniform standards of eligibility and operating procedures are published in the Federal Register. Codified, they appear at 7 CFR Parts 270–275.

Eligibility for food stamps is determined on the basis of household income and various additional factors. For example, by amendment to the Food Stamp Act, Congress required that a household which includes an able-bodied adult between 18 and 65 years of age shall not be eligible for assistance if such person fails to meet certain employment criteria (7 U.S.C. § 2014(c). The regulations provide that a household may be found ineligible or its food stamp benefits terminated if such household refuses to cooperate in providing the information necessary for making a determination of eligibility or ineligibility (7 CFR Part 271.3(a)(1)(i)). To implement the statutory work requirement, a household may also be declared ineligible if a household member refuses without good cause to register for work, refuses to report for a job interview or refuses to accept a bona fide offer of suitable employment (7 CFR Part 217.3(d)(2)).

Plaintiffs-intervenors do not challenge the right of the Government to punish violations of the Food Stamp Act by criminal prosecution under 7 U.S.C. § 2023. It is the administratively imposed sanction of denying food stamp benefits because of fraud that plaintiffs-intervenors challenge as being contrary to sections 4(a) (7 U.S.C. § 2013(a)) and 5(b) (7 U.S.C. § 2014(b)) of the Act. In providing criminal penalties for the misuse or wrongful acquisition of food stamps, Congress chose not to rely on the general criminal statutes in Title 18 of the United States Code. Instead, Congress included criminal sanctions as part of the Food Stamp Act. In that connection, the Act makes it unlawful to knowingly use, transfer, acquire, alter or possess food stamps or authorization to purchase cards in a manner not authorized by the Act or by the regulations. If the stamps or authorization to purchase cards are worth less than $100, the violation is a misdemeanor punishable by a fine of up to $5,000, one year's imprisonment, or both. Where $100 or more is involved, the violation is a felony punishable by up to 5 year's imprisonment, a fine of not more than $10,000, or both.

Specific authority for State agencies to deny food stamps to a household who obtains such stamps by fraud is derived from the challenged regulation here at issue. The issue for decision is whether the power to exclude such a household from participation in the program is inherent in and necessarily incident to the effective administration of the statutory scheme. A similar question was presented in *Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 334 F.2d 570 (1964). There, plaintiffs were temporarily barred from participating in certain contracts with the Commodity Credit Corporation because of their misuse of official inspection certificates. Appellants contended, *inter alia,* that debarment was neither authorized by statute or by regulation. Though the debarment was invalidated on

---

**13.** "Household" is defined in section 3(e) of the Act as "a group of . . . individuals . . who are not residents of an institution or boarding house, but are living as one economic unit sharing common cooking facilities and for whom food is customarily purchased in common. . . . ."

appeal because of a lack of procedural regulations providing notice, hearings and findings,[14] the appellant court affirmed the power of the Commodity Credit Corporation to debar contractors who were doing business with the Corporation and were irresponsible, defaulting or dishonest. "Notwithstanding its severe impact upon a contractor," the court ruled, "debarment is not intended to punish but is a necessary 'means for accomplishing the congressional purpose' of the Commodity Credit to 'aid in the development of foreign markets for, agricultural commodities.'" The court concluded that "without such power to deal with irresponsible bidders and contractors, the efficiency of Commodity Credit's operations would be severely impaired. See *L. P. Steuart & Bro., Inc. v. Bowles,* 322 U.S. 398, 406, 64 S.Ct. 1097, 88 L.Ed. 1350 (1944)." And in *Niagara Mohawk Power Corporation v. Federal Power Commission,* 126 U.S. App.D.C. 376, 379 F.2d 153, 159 (1967), which involved the issuance of a power company license, the court declared that "while [a] license may not be unreasonably or unlawfully withheld, it certainly need not be extended to an applicant not ready to redress his default by discharging the duty he should by rights have assumed without nudging." Unlike *Gonzalez,* the denial of food stamps to plaintiffs-intervenors was pursuant to authority contained in a regulation undoubtedly designed to prevent fraud by both applicant and recipient alike.

■ We conclude that the power to temporarily disqualify a household from receiving food stamps is inherent in and necessarily incident to the effective administration of the Food Stamp Act. The challenged

regulation from which the State agency derived its authority to deny food stamps, in the circumstance here involved, is a valid and reasonable exercise of the authority provided to the Secretary under the Act.

Plaintiffs-intervenors contention that they are eligible for food stamps even if they acquired the stamps by fraud is patently unreasonable and unsupportable. Acceptance of this contention would render meaningless the criteria for eligibility which are designed to protect the program from abuse, thus insuring that available resources are made available only to the truly needy. To a large degree, the integrity of such a program must depend in large measure upon the accuracy and honesty in fact of applicants and recipients. More importantly, judicial endorsement of this contention would discourage rather than encourage the good faith dealing between parties so necessary to administer with equity and fairness this and all other similar federal programs involving many millions of applicants and recipients. Principles of equity and justice require that plaintiffs-intervenors not be permitted to profit by their own wrongdoing. Accordingly, the injunctive relief sought must be DENIED.

---

14. Food Stamp Program regulations comply with due process requirements by providing to those adversely affected by State agency action notice and an opportunity to be heard. Section 271.1(n) provides that "prior to any action to reduce or terminate a household's program benefits . . . the State agency shall . . provide such household 10 day's advance notice before such action is taken." And section 271.1(*o*) requires the State agency to "provide any household aggrieved by any action of the State agency . . . with a fair hearing before the Agency or with an evidentiary hearing at the local level with a right to appeal to an Agency hearing."