DECISION
Plaintiff-appellant, Arth Brass and Aluminum Castings, Inc. ("Arth"), appeals from a judgment of the Franklin County Court of Common Pleas denying its motion for summary judgment and granting the summary judgment motion of defendant- appellee, James Conrad, Administrator of the Bureau of Workers' Compensation ("bureau").
Arth is a merit-rated, state-fund insured employer for purposes of Ohio's Workers' Compensation Act. On June 28, 1997, the bureau received and filed a claim requesting payments of disability compensation and medical benefits on behalf of Nuncio Ayala, an Arth employee who alleged that he had sustained or contracted "bilateral carpal tunnel syndrome" in the course of his employment with Arth. On July 21, 1997, the bureau published an order allowing Ayala's claim for an industrial injury. On November 1, 1997, following an appeal and remand over the issue of whether Ayala's claim should be classified as an industrial injury or an occupational disease, the bureau issued a second order allowing Ayala's claim as an occupational disease. On January 7, 1998, the issue of whether Ayala was entitled to participate for his claim was heard by a district hearing officer, who entered an order allowing the claim. Arth appealed from the district hearing officer's order. Following a hearing, a staff hearing officer issued an order allowing Ayala's claim on February 10, 1998. Arth appealed the staff hearing officer's order to the Cuyahoga County Court of Common Pleas. On December 12, 2000, the Cuyahoga County Court of Common Pleas entered a final judgment concluding that Ayala was not entitled to participate for his "occupational disease" claim. Ayala did not appeal from that judgment.
While Arth's appeal from the staff hearing officer's order was pending in the Cuyahoga County Court of Common Pleas, the bureau made payments to Ayala's medical providers for treatment of his "occupational disease" totaling $10,497. Specifically, between July 1, 1998 and July 1, 1999, the bureau paid Ayala's medical providers $9,395, and between July 1, 1999 and July 1, 2000, the bureau paid Ayala's medical providers an additional $1,102. On July 1, 1999, the bureau charged the $9,395 it had thus far paid on Ayala's claim to Arth's risk account. Similarly, on July 1, 2000, the bureau charged the final $1,102 it paid to Ayala's medical providers to Arth's risk account.
When Arth learned that the bureau had charged the payments made on Ayala's claim to its risk account during the pendency of its appeal from the staff hearing officer's order, Arth filed a letter of protest with the bureau. The bureau denied Arth's protest on January 13, 2000. Arth appealed the denial of its protest to the bureau's adjudicating committee. Following a hearing, the adjudicating committee denied Arth's protest on July 26, 2000. Arth then appealed the matter to the administrator. On October 5, 2000, a telephone hearing on Arth's appeal was heard by a designee of the administrator. On October 24, 2000, the administrator entered a final order adopting the decision of the adjudicating committee as his own.
On December 11, 2000, Arth filed a declaratory judgment action in the Franklin County Court of Common Pleas seeking declarations that: (1) the bureau's policy and practice of issuing payments from the state workers' compensation insurance fund to a claimant's medical care providers after the approval of the claim by a staff hearing officer, but while an appeal by the claimant's employer from the staff hearing officer's order remains pending, is unlawful; (2) the bureau's policy and practice of charging payments made to a claimant's medical care providers to the risk account of the claimant's employer while the employer's appeal from the staff hearing officer's order allowing the claim remains pending, is unlawful; and (3) the bureau is legally obligated to (a) credit Arth's risk account for all amounts charged thereto for payments made to Ayala's medical provider's, and (b) credit Arth's risk account in the amount of the additional premiums it paid as the result of the improper charging of payment's made to Ayala's medical providers to its risk account.
On June 6, 2001, Arth filed a motion for summary judgment. On July 19, 2001, the bureau filed a cross motion for summary judgment. On August 13, 2001, Arth filed a motion to strike the affidavits of Scott Coghlan and Rex Blateri which the bureau had attached in support of its cross motion for summary judgment. On November 16, 2002, the trial court issued a decision denying Arth's motions to strike and for summary judgment, granting the bureau's motion for summary judgment, and dismissing Arth's declaratory judgment action with prejudice. Arth appeals therefrom assigning the following errors:
"ASSIGNMENT OF ERROR NO. 1:
"The Trial Court Committed Error Prejudicial To Appellant By Overruling Appellant's Motion For Summary Judgment.
"ASSIGNMENT OF ERROR NO. 2:
"The Trial Court Committed Error Prejudicial To Appellant By Granting Appellee's Cross-Motion For Summary Judgment.
"ASSIGNMENT OF ERROR NO. 3:
"The Trial Court Committed Error Prejudicial To Appellant By Overruling Appellant's Motion To Strike The Affidavits Of Scott Coghlan And Rex Blateri From The Record For Purposes Of Determining The Parties' Opposing Motions For Summary Judgment."
We will begin with Arth's third assignment of error, as the issues raised therein have the potential to effect the issues raised in Arth's other assignments of error.
Arth's third assignment of error challenges the trial court's denial of its motion to strike the affidavits of Scott Coghlan, Ayala's former counsel, and Rex Blateri[1], an Underwriting Supervisor employed in the Risk Technical Services section of the bureau. Arth contends that Coghlan's affidavit should be stricken because it is irrelevant and prejudicial in that it suggests that Arth ultimately prevailed on its appeal of Ayala's workers' compensation claim because Ayala, a foreign national, could not afford to return from his home country to prosecute his case. Arth contends that Blateri's affidavit should be stricken because the second paragraph contains an improper legal opinion regarding the basis for the bureau's charging of Arth's risk account.
A trial court has broad discretion in determining whether to admit or exclude evidence, and in reviewing a trial court's decision in that regard, an appellate court is limited to determining whether the trial court abused its discretion. Rigby v. Lake Cty. (1991), 58 Oho St.3d 269, 271. An abuse of discretion connotes more than an error of judgment; it implies a decision that is without a reasonable basis, and one that is clearly wrong. Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,219. While we agree with Arth that Coghlan's affidavit has little relevance to the issue presented by the parties' motions for summary judgment, and that Blateri's affidavit contains a minor legal conclusion, there is no evidence that Arth was prejudiced by either of these affidavits. Further, any prejudice that Arth may have suffered will be cured by our de novo review of the record. Accordingly, we cannot say that the trial court admission of these affidavits constituted an abuse of discretion.
Arth's third assignment of error is overruled.
Arth's first and second assignments of error will be addressed together as they raise related issues regarding the trial court's denial of Arth's motion for summary judgment and granting of the bureau's motion for summary judgment. Because these assignments of error concern the trial court's rulings on motions for summary judgment, we review the trial court's determination independently, and without deference. Brown v.Scioto Cty. Bd. of Commrs. (1993), 87 Ohio App.3d 704, 711. In conducting our review, we apply the same standard as the trial court,Maust v. Bank One Columbus, N.A. (1992), 83 Ohio App.3d 103, 107. In accordance with Civ.R. 56, summary judgment may only be granted if, viewing the evidence most strongly in favor of the nonmoving party, no genuine issue of fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can only come to a conclusion which is adverse to the nonmoving party. Harless v. Willis Day WarehousingCo. (1978), 54 Ohio St.2d 64. A motion for summary judgment first forces the moving party to inform the court of the basis of the motion and to identify portions in the record that demonstrate the absence of a genuine issue of material fact. Dresher v. Burt (1996), 75 Ohio St.3d 280, 296.
Under its first and second assignments of error, Arth contends that it was entitled to summary judgment declaring that: (1) it was unlawful for the bureau to make payments to Ayala's medical providers while Arth's appeal from the staff hearing officer's order was pending before the common pleas court; (2) it was unlawful for the bureau to charge the amounts paid for Ayala's medical benefits to Arth's risk account while Arth's appeal from the staff hearing officer's order was pending before the common pleas court; and (3) as a result of the above unlawful conduct, the bureau must credit Arth's risk account in (a) the amount of the payments made for Ayala's medical benefits, and (b) the amount of the increased premiums Arth paid during the period in which the amounts paid for Ayala's medical benefits were shown as charges against its risk account. Preliminarily, in support of its motion for summary judgment the bureau submitted uncontroverted evidence, in the form of Rex Blateri's July 19, 2001 affidavit, that after the Cuyahoga County Court of Common Pleas issued its decision denying Ayala's claim, the bureau credited Arth's risk account for the entire amount it had charged thereto for payment of Ayala's medical providers. However, the crediting of Arth's risk account in the amounts paid for Ayala's claim does not end our inquiry. Arth also contends that the bureau must credit its risk account in the amount of the increased workers' compensation premiums it paid during the period in which the amounts paid to Ayala's medical providers were charged to its account.
We will first address Arth's claim that the bureau's payment of Ayala's medical providers after the staff hearing officer issued his order, but while Arth's appeal from that order was pending in the court of common pleas, was unlawful. In support of its position, Arth first argues that statements contained in an official guide published by the bureau constitutes an admission by the bureau that its payment of Ayala's medical providers while Arth's appeal was pending was unlawful. Specifically, Arth points to the statement that "[m]edical payments are not made until the appeal process is completed," which appears in the Workers' Compensation Guide for Self-Insuring Employers and their Employees. We do not dispute that the statement in the guide conflicts with the bureau's current position regarding the time when medical benefits are to be paid. However, in arguing that the statement constitutes an admission, Arth is erroneously attempting to apply a factual analysis to a question of law. The issue of whether the bureau had the authority to pay Ayala's medical providers while Arth's appeal was pending is purely a question of law, which must be answered by reference to the relevant statutes. The bureau cannot, through statements in an official publication, enlarge or diminish the authority conferred on it by those statues.
Arth next argues that the bureau's payments to Ayala's medical providers while its appeal was pending in the common pleas court was in violation of R.C. 126.30(D), which provides in relevant part as follows:
"In applying this section to invoices submitted to the bureau of workers' compensation for equipment, materials, goods, supplies, or services provided to employees in connection with an employee's claim against the state insurance fund * * * as compensation for injuries or occupational disease pursuant to Chapter 4123. * * * of the Revised Code, the required payment date shall be the date on which payment is due under the terms of a written agreement between the bureau and the provider. If a specific payment date is not established by a written agreement, the required payment date shall be thirty days after the bureau receives a proper invoice for the amount of the payment due or thirty days after the final adjudication allowing payment of an award to the employee, whichever is later. Nothing in this section shall supersede any faster timetable for payments to health care providers contained in sections 4121.44 and 4123.512 of the Revised Code.
"* * *
"For purposes of this division, `final adjudication' means the later of the date of the decision or other action by the bureau, the industrial commission, or a court allowing payment of the award to the employee from which there is no further right to reconsideration or appeal that would require the bureau to withhold compensation and benefits, or the date on which the rights to reconsideration or appeal have expired without an application therefor having been filed or, if later, the date on which an application for reconsideration or appeal is withdrawn. * * *"
According to Arth, R.C. 126.30(D) provides that the bureau may not make payments from the state insurance fund until the "required payment date." The "required payment date" for purposes of Ayala's claim was 30 days after the "final adjudication," of his claim, and the "final adjudication" of Ayala's claim did not occur until the Cuyahoga County Court of Common Pleas issued its decision and Ayala did not appeal therefrom. We acknowledge that when R.C. 126.30(D) is read in isolation, the subsection does appear to support Arth's argument. However, it is well settled that in attempting to determine the meaning of a statutory subsection, the subsection cannot be read in isolation, but must be read in the context of the entire statute of which it is a part. City of New Philadelphia, Ohio v. Bradburn (July 23, 1981), Tuscarawas App. No. CA 1547; Oates v. Oates (C.A.6, 1989), 866 F.2d 203,206. When R.C. 126.30(D) is read in the context of the balance of R.C.126.30, the error in Arth's reading of R.C. 126.30(D) is readily apparent.
R.C. 126.30 provides in its entirety:
"(A) Any state agency that purchases, leases, or otherwise acquires any equipment, materials, goods, supplies, or services from any person and fails to make payment for the equipment, materials, goods, supplies, or services by the required payment date shall pay an interest charge to the person in accordance with division (E) of this section, unless the amount of the interest charge is less than ten dollars. Except as otherwise provided in division (B), (C), or (D) of this section, the required payment date shall be the date on which payment is due under the terms of a written agreement between the state agency and the person or, if a specific payment date is not established by such a written agreement, the required payment date shall be thirty days after the state agency receives a proper invoice for the amount of the payment due.
"(B) If the invoice submitted to the state agency contains a defect or impropriety, the agency shall send written notification to the person within fifteen days after receipt of the invoice. The notice shall contain a description of the defect or impropriety and any additional information necessary to correct the defect or impropriety. If the agency sends such written notification to the person, the required payment date shall be thirty days after the state agency receives a proper invoice.
"(C) In applying this section to claims submitted to the department of job and family services by providers of equipment, materials, goods, supplies, or services, the required payment date shall be the date on which payment is due under the terms of a written agreement between the department and the provider. If a specific payment date is not established by a written agreement, the required payment date shall be thirty days after the department receives a proper claim. If the department determines that the claim is improperly executed or that additional evidence of the validity of the claim is required, the department shall notify the claimant in writing or by telephone within fifteen days after receipt of the claim. The notice shall state that the claim is improperly executed and needs correction or that additional information is necessary to establish the validity of the claim. If the department makes such notification to the provider, the required payment date shall be thirty days after the department receives the corrected claim or such additional information as may be necessary to establish the validity of the claim.
"(D) In applying this section to invoices submitted to the bureau of workers' compensation for equipment, materials, goods, supplies, or services provided to employees in connection with an employee's claim against the state insurance fund, the public work-relief employees' compensation fund, the coal-workers pneumoconiosis fund, or the marine industry fund as compensation for injuries or occupational disease pursuant to Chapter 4123., 4127., or 4131. of the Revised Code, the required payment date shall be the date on which payment is due under the terms of a written agreement between the bureau and the provider. If a specific payment date is not established by a written agreement, the required payment date shall be thirty days after the bureau receives a proper invoice for the amount of the payment due or thirty days after the final adjudication allowing payment of an award to the employee, whichever is later. Nothing in this section shall supersede any faster timetable for payments to health care providers contained in sections4121.44 and 4123.512 of the Revised Code.
"For purposes of this division, a `proper invoice' includes the claimant's name, claim number and date of injury, employer's name, the provider's name and address, the provider's assigned payee number, a description of the equipment, materials, goods, supplies, or services provided by the provider to the claimant, the date provided, and the amount of the charge. If more than one item of equipment, materials, goods, supplies, or services is listed by a provider on a single application for payment, each item shall be considered separately in determining if it is a proper invoice.
"If prior to a final adjudication the bureau determines that the invoice contains a defect, the bureau shall notify the provider in writing at least fifteen days prior to what would be the required payment date if the invoice did not contain a defect. The notice shall contain a description of the defect and any additional information necessary to correct the defect. If the bureau sends a notification to the provider, the required payment date shall be redetermined in accordance with this division after the bureau receives a proper invoice.
"For purposes of this division, `final adjudication' means the later of the date of the decision or other action by the bureau, the industrial commission, or a court allowing payment of the award to the employee from which there is no further right to reconsideration or appeal that would require the bureau to withhold compensation and benefits, or the date on which the rights to reconsideration or appeal have expired without an application therefor having been filed or, if later, the date on which an application for reconsideration or appeal is withdrawn. If after final adjudication, the administrator of the bureau of workers' compensation or the industrial commission makes a modification with respect to former findings or orders, pursuant to Chapter 4123., 4127., or 4131. of the Revised Code or pursuant to court order, the adjudication process shall no longer be considered final for purposes of determining the required payment date for invoices for equipment, materials, goods, supplies, or services provided after the date of the modification when the propriety of the invoices is affected by the modification.
"(E) The interest charge on amounts due shall be paid to the person for the period beginning on the day after the required payment date and ending on the day that payment of the amount due is made. The amount of the interest charge that remains unpaid at the end of any thirty-day period after the required payment date, including amounts under ten dollars, shall be added to the principal amount of the debt and thereafter the interest charge shall accrue on the principal amount of the debt plus the added interest charge. The interest charge shall be at the rate per calendar month that equals one-twelfth of the rate per annum prescribed by section 5703.47 of the Revised Code for the calendar year that includes the month for which the interest charge accrues.
"(F) No appropriations shall be made for the payment of any interest charges required by this section. Any state agency required to pay interest charges under this section shall make the payments from moneys available for the administration of agency programs.
"If a state agency pays interest charges under this section, but determines that all or part of the interest charges should have been paid by another state agency, the state agency that paid the interest charges may request the attorney general to determine the amount of the interest charges that each state agency should have paid under this section. If the attorney general determines that the state agency that paid the interest charges should have paid none or only a part of the interest charges, the attorney general shall notify the state agency that paid the interest charges, any other state agency that should have paid all or part of the interest charges, and the director of budget and management of the attorney general's decision, stating the amount of interest charges that each state agency should have paid. The director shall transfer from the appropriate funds of any other state agency that should have paid all or part of the interest charges to the appropriate funds of the state agency that paid the interest charges an amount necessary to implement the attorney general's decision.
"(G) Not later than forty-five days after the end of each fiscal year, each state agency shall file with the director of budget and management a detailed report concerning the interest charges the agency paid under this section during the previous fiscal year. The report shall include the number, amounts, and frequency of interest charges the agency incurred during the previous fiscal year and the reasons why the interest charges were not avoided by payment prior to the required payment date. The director shall compile a summary of all the reports submitted under this division and shall submit a copy of the summary to the president and minority leader of the senate and to the speaker and minority leader of the house of representatives no later than the thirtieth day of September of each year."
It is patently obvious from even a cursory reading of all of R.C. 126.30
that the section is primarily addressed to the payment of interest by state agencies. The language of R.C. 126.30(A) plainly and unambiguously mandates that state agencies pay interest charges when they fail to pay invoices for goods or services furnished to them in a timely fashion. R.C. 126.30(F) addresses the source of the funds that are to be used to make the interest payments mandated by the section. Finally, R.C. 126.30(G) addresses the duty of state agencies to report the interest payments made under the section.
More specifically, R.C. 126.30(A) provides that state agencies must pay interest charges when they fail to pay invoices by the "required payment date," as that term is variously defined in R.C. 126.30. R.C. 126.30(A) then goes on to provide the general definition of "required payment date," while subsections (B), (C), and (D) provide additional definitions of "required payment date" applicable to specific circumstances and state agencies. In particular, R.C. 126.30(D) defines the "required payment date" for purposes of establishing when interest begins to accrue on amounts owed by the bureau. When R.C. 126.30(D) is read in context, it unambiguously serves to establish the time at which interest charges on late invoice payments by the bureau begin to accrue, but does not, as Arth contends, establish the earliest time that the bureau may make payment on the underlying obligations.
Arth argues, however, that even if R.C. 126.30 itself does not establish the earliest time that the bureau may make payment on an invoice, the bureau, through the promulgation of Ohio Adm. Code 4123-7-31
and 4123-6-42, has adopted the definition of "required payment date" set forth in R.C. 126.30(D) as the earliest time that it may make payments on an invoice. Ohio Adm. Code 4123-7-31 provides in relevant part:
"(A) The bureau of workers' compensation shall pay bills for equipment, materials, goods, supplies, or services incurred by the claimant in connection with claims against the state insurance fund * * * in accordance with the prompt payment provisions of section 126.30 of the Revised Code. For the purpose of this rule, the required payment date shall be the date on which payment is due under the terms of a written agreement between the bureau and the provider, thirty days after the bureau receives a proper invoice for the amount of the payment due, or thirty days after the final adjudication allowing payment of an award to the employee, whichever is later.
"* * *
"(3) * * * As defined in section 126.30 of the Revised Code, `final adjudication' is the date that the decision of the bureau, commission, or court becomes final, with no further right of appeal. * * *"
Similarly, Ohio Adm. Code 4123-6-42 provides in relevant part:
"(A) Payment is made for equipment, materials, goods, supplies, or services incurred by the claimant in connection with claims against the state insurance fund * * * based on section 126.30 of the Revised Code. For the purpose of this rule, the required payment date is the date on which payment is due under the terms of a written agreement between the bureau, or its agent, and the provider. Payment will be made either thirty days after the bureau, or its agent, receives a proper invoice for the amount of the payment due, or thirty days after the final adjudication allowing payment of an award to the claimant, whichever is later.
"* * *
"(3) * * * As defined in section 126.30 of the Revised Code, `final adjudication' is the date that the decision of the bureau, commission, or court becomes final, with no further right of appeal. * * *"
While the language of Ohio Adm. Code 4123-7-31 and 4123-6-42 does suggest that these provisions were intended to adopt R.C. 126.30(D)'s definition of "required payment date" as the time that the bureau becomes obligated to pay most claims against the state insurance fund, such a reading of the sections is untenable. It is well established that a regulation cannot expand the scope of the statute under which its was promulgated. Thus, because R.C. 126.30 pertains only to the time at which interest begins to accrue, the scope of Ohio Adm. Code 4123-7-31 and4123-6-42 is similarly limited.
In fact, neither R.C. 126.30 nor any administrative code sections pro-mulgated thereunder have any bearing upon when the bureau must pay workers' compensation claims, including claims for medical benefits. R.C. 4121.39 provides that the bureau shall "[m]ake payment on orders of the industrial commission and district and staff hearing officers as provided in section 4123.511 of the Revised Code." State ex rel. Crabtreev. Ohio Bur. of Workers' Comp. (1994), 71 Ohio St.3d 504, 507. In turn, R.C. 4123.511(H) and (I) establish the time at which the bureau must make such payments as follows:
"(H) Except as provided in section 4121.63 of the Revised Code and division (J) of this section, payments of compensation to a claimant or on behalf of a claimant as a result of any order issued under this chapter shall commence upon the earlier of the following:
"(1) Fourteen days after the date the administrator issues an order under division (B) of this section, unless that order is appealed;
"(2) The date when the employer has waived the right to appeal a decision issued under division (B) of this section;
"(3) If no appeal of an order has been filed under this section or to a court under section 4123.512 of the Revised Code, the expiration of the time limitations for the filing of an appeal of an order;
"(4) The date of receipt by the employer of an order of a district hearing officer, a staff hearing officer, or the industrial commission issued under division (C), (D), or (E) of this section.
"(I) No medical benefits payable under this chapter or Chapter 4121., 4127., or 4131. of the Revised Code are payable until the earlier of the following:
"(1) The date of the issuance of the staff hearing officer's order under division (D) of this section;
"(2) The date of the final administrative or judicial determination."
R.C. 4123.511(H) sets forth the time at which the bureau is obligated to begin making payments of compensation to or on behalf of a workers' compensation claimant. However, with respect to payments of medical benefits, R.C. 4123.511(I) modifies the payment times set forth in R.C.4123.511(H) by prohibiting the bureau from paying medical benefits before the earlier of the issuance of the staff hearing officer's order or the date of the final administrative or judicial determination in a case. Read together, R.C. 4123.511(H) and (I) provide that the bureau is obligated to pay medical benefits at the earliest of times set forth in R.C. 4123.511(H), unless the earliest of those times occurs prior to both the issuance of the staff hearing officer's order and the date of the final administrative or judicial determination in the case. In such a case, the bureau is not obligated to pay medical benefits until the occurrence of the earlier of the latter two events. However, once the earliest of the events listed in both R.C. 4123.511(H) and (I) have occurred, the bureau becomes obligated to pay medical benefits on behalf of a claimant irrespective of whether the claimant's employer has pursued a further appeal.
Additional support for the above reading of R.C. 4123.511(H) and (I) is found in R.C. 4123.512(H), which provides as follows:
"(H) An appeal from an order issued under division (E) of section4123.511 of the Revised Code or any action filed in court in a case in which an award of compensation has been made shall not stay the payment of compensation under the award or payment of compensation for subsequent periods of total disability during the pendency of the appeal. If, in a final administrative or judicial action, it is determined that payments of compensation or benefits, or both, made to or on behalf of a claimant should not have been made, the amount thereof shall be charged to the surplus fund under division (B) of section 4123.34 of the Revised Code. * * *"
This provision expressly indicates that an appeal by an employer following an award of compensation does not stay the payment of compensation. Further, the provision presumes that the bureau will sometimes be required to make benefit payments while the claimant's employer has an appeal pending.
In the present case, the earliest of applicable times set forth under R.C. 4123.511(H) occurred when Arth received the district hearing officer's order approving Ayala's claim. Because this time occurred prior to either the issuance of the staff hearing officer's order or the final administrative or judicial determination in the case, as set forth in R.C. 4123.511(I), the bureau did not become obligated to pay any medical benefits on behalf of Ayala until the earlier of these two events: the issuance of the staff hearing officer's order on February 10, 1998. However, once the staff hearing officer's order issued, the bureau was required to pay any bills submitted by Ayala's medical providers, regardless of the fact that Arth had appealed the staff hearing officer's order to the court of common pleas.
Finally, Arth contends that the bureau's payment of medical benefits was unlawful because the staff hearing officer's order of February 10, 1998 did not specifically order the payment of such benefits. No such specific order was necessary. As discussed above, once the staff hearing officer's order approving Ayala's claim was issued, the bureau became obligated under R.C. 4123.511(H) and (I) to pay for Ayala's medical benefits as requests for such payment were submitted to it by Ayala's medical providers.
Arth next contends that the bureau's charging of medical benefits paid on Ayala's behalf to Arth's risk account while Arth's appeal was pending in the court of common pleas was unlawful. Arth argues that the bureau's practice of charging medical benefit payments to state-fund insured employers' risk accounts while the employers have appeals pending violated its right to equal protection as guaranteed by theFourteenth Amendment to the United States Constitution, in that self-insured employers are not required to shoulder the same burden. This argument is completely without merit. Any comparison of state-fund insured employers to self-insured employers with respect to premiums is illogical, as self-insured employers do not pay premiums. Consequently, the conduct of the bureau with respect to Arth's premiums has no comparable counterpart for self-insured employers. Further, even if the bureau's practice of charging medical benefit payments to an employer's risk account while the employer's appeal remains pending does somehow disadvantage state-fund insured employers relative to their self-insured counterparts, such disparate treatment does not rise to the level of an equal protection violation. Not every case in which the government treats two groups differently rises to the level of an equal protection violation.Jefferson v. Hackney (1972), 406 U.S. 535, 92 S.Ct. 1724.
The bureau contends that R.C. 4123.34(A) authorizes it to charge payments made prior to the issuance of the final administrative or judicial determination of a case to the employers' risk account. We disagree. R.C. 4123.34(A) provides as follows:
"* * * The administrator shall observe all of the following requirements in fixing the rates of premium for the risks of occupations or industries:
"(A) He shall keep an accurate account of * * * the money received from each individual employer and the amount of losses incurred against the state insurance fund on account of injuries, occupational disease, and death of the employees of the employer."
This provision requires that the bureau keep track of the losses that the state insurance fund incurs as a result of the workers' compensation claims brought against each individual employer. However, the provision does not specify the manner in which the bureau is to track such losses, and certainly does not mandate that losses incurred while an employer's appeal remains pending be charged to the employer's risk account.
The procedures to be employed by the bureau in dealing with benefit payments made prior to the issuance of a final determination of a case are actually governed by R.C. 4123.512(H), which provides in relevant part as follows:
"* * * If, in a final administrative or judicial action, it is determined that payments of compensation or benefits, or both, made to or on behalf of a claimant should not have been made, the amount thereof shall be charged to the surplus fund under division (B) of section 4123.34
of the Revised Code. In the event the employer is a state risk, the amount shall not be charged to the employer's experience. * * *"
R.C. 4123.511(H) is ambiguous with respect to when the bureau may charge an employer's risk account for benefit payments made on behalf of a state-fund insured employer's employee, as two reasonable and equally plausible meanings are conveyed by the language of the statute. FamilyMedicine Found., Inc. v. Bright, 96 Ohio St.3d 183, 2002-Ohio-4034, at ¶ 8. On the one hand, the bureau argues that the provision provides that where a final administrative or judicial decision determines that benefit payments made by the bureau should not have been made, the amount of such payments, shall be charged to the surplus fund, and where the employer is a state-fund insured employer, credited to the employer's risk account. On the other hand, Arth argues that the provision provides that where a final administrative or judicial decision determines that benefit payments made by the bureau should not have been made, the amount of such payments shall be charged to the surplus fund, and where the claimant's employer is a state-fund insured employer, the amount of such payments shall never be charged to the employers risk account.
The primary distinction between these two possible interpretations of R.C. 4123.512(H) is in how the bureau must treat benefit payments made prior to a final administrative or judicial determination in a case. The bureau's interpretation presumes that all benefit payments will be charged to the claimant's employer's risk account, and if it is later determined that the benefit payments were improper, the bureau will credit the employer's risk in the amount of the payments. In contrast, Arth's interpretation assumes that although the bureau will sometimes make benefit payments prior to a final administrative or judicial determination of a case, such payments will never be charged to the claimant's employer's risk account, as the bureau cannot charge benefit payments to an employer's risk account until after the final administrative or judicial determination of the case.
In choosing between the two interpretations of R.C. 4123.512(H) offered by the parties, we are mindful of the principle that a court must defer to an agency's reasonable interpretation of a statute within its purview. Northwestern Ohio Bldg. Constr. Trades Council v. Conrad
(2001), 92 Ohio St.3d 282, 287; Donia v. Ohio Dept. of Health (May 7, 2001), Guernsey App. No. 00CA26. It has been held that where a statute dealing with an issue of administrative law is ambiguous, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural ResourcesDefense Council, Inc. (1984), 467 U.S. 837, 843, 104 S.Ct. 2778, 2782. Because the bureau's interpretation of R.C. 4123.512(H) is plainly reasonable, we adopt that interpretation as the meaning of the statute. Accordingly, the bureau acted lawfully when it charged the amounts paid for Ayala's medical benefits to Arth's risk account while Arth's appeal was pending in the court of common pleas.
Arth also seeks a declaration that the bureau must credit its risk account in the amount of the increased premiums it paid as a result of the bureau's charging of Ayala's medical benefit payments to its risk account. In order to establish a right to such a declaration, Arth must show that the bureau's actions were the cause of its increased premiums, and that it has a clear legal right to have those increased premiums credited to its risk account.
As it relates to causation, the bureau does not dispute the fact that Arth's workers' compensation premiums increased significantly after it charged Ayala's medical benefit payments to Arth's risk account. Further, at the October 5, 2000 telephone hearing before the administrator's designee, Rex Blateri admitted that the bureau's act of charging Arth's risk account in the amount of Ayala's medical benefit payments negatively impacted Arth's premiums during the period in which the charges remained in place. While there is other evidence that indicates that Arth's increased premiums were caused by factors other than the bureau's charging of Ayala's medical benefit payments to Arth's risk account, Blateri's testimony is sufficient to create a question of fact on causation.
While Arth succeeded in raising a question of fact regarding causation, it nonetheless failed to establish that it had a legal right to a credit in the amount of the increased premiums it paid. In support of its claim to such a credit, Arth points to R.C. 4123.512(H) and procedural due process considerations guaranteed by theFourteenth Amendment to the United States Constitution and Section 16, Article I, Ohio Constitution. Arth claims that the language in R.C. 4123.512(H) which requires that benefit payments charged to a state-fund insured employer's risk account be credited in the event that there is a final determination that the payments should not have been made somehow requires the bureau to credit its risk account in the amount of its increased premiums. Nothing in the language of R.C. 4123.512(H) or any other statutory provision we have located requires such a result.
Arth's procedural due process argument is also without merit. Where a violation of procedural due process is alleged, the underlying deprivation of a constitutionally protected life, liberty, or property interest is not the alleged constitutional violation. Parratt v. Taylor
(1981), 451 U.S. 527, 537, 101 S.Ct. 1908, overruled on other grounds byDaniels v. Williams (1986), 474 U.S. 327, 330-331, 106 S.Ct. 662. Rather, the constitutional violation is the deprivation of such an interest without due process of law. Id. In the present case, the protest process afforded by Ohio Adm. Code 4123-17-27, the appeals therefrom afforded by Ohio Adm. Code 4123-14-06 and the instant declaratory judgment action provided Arth with an extensive process by which to challenge the allegedly improper premium increases. Consequently, Arth has suffered no violation of its right to procedural due process as guaranteed by the United States and Ohio Constitutions.
Arth's first and second assignments of error are overruled.
Arth's three assignments of error having been overruled, the judgment of the Franklin County Court of Common Pleas is affirmed.
Judgment affirmed.
BOWMAN and LAZARUS, JJ., concur.
[1] The bureau actually submitted two affidavits by Rex Blateri, one dated July 19, 2001 and one dated October 24, 2001. Arth's motion to strike concerns the earlier of these two affidavits.